IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS E. PEREZ, Secretary of Labor, United States Department of Labor, | No. C 14-2337 CW<br>ORDER FINDING DEFENDANTS IN CONTEMPT AND MODIFYING PRELIMINARY INJUNCTION |
| Plaintiff, | |
| v. | |
| FATIMA/ZAHRA, INC., d/b/a LAKE ALHAMBRA ASSISTED LIVING CENTER, a California corporation; MEHRANGIZ SARKESHIK, an individual; and ABOLFAZL SARKESHIK, an individual; | (Docket No. 23) |
| Defendants. | |

This is a wage and hour case that Plaintiff Department of Labor (DOL) is pursuing against Defendants Fatima/Zahra Inc., dba Lake Alhambra Assisted Living Center; Mehrangiz Sarkeshik; and Abolfazl Sarkeshik.  On May 22, 2014, the Court issued a temporary restraining order (TRO) enjoining Defendants from retaliating against their employees.  On June 5, 2014, the Court held a preliminary injunction hearing and expressed that it was likely to grant a preliminary injunction.  On June 20, 2014, the Court issued a written order summarizing the preliminary injunction. That same day, the DOL filed a motion seeking an order to show cause (OSC) why Defendants should not be held in contempt.  The Court issued an OSC, setting an expedited briefing schedule and ordering Defendants to appear at the hearing.  See Docket No. 25. On July 3 and 7, 2014, the Court held an OSC hearing, which

included testimony.  At the hearing, the Court asked for authority addressing some of the remedies proposed by the DOL.  After the hearing, on July 14, 2014, the DOL filed a post-hearing brief addressing potential remedies.  Defendants did not file a response.  Having considered the papers, testimony, and arguments of counsel, the Court finds Defendants to be in contempt of both the TRO and the preliminary injunction.  The Court further enjoins the sale of Defendants' business until certain condition have been met.

FINDINGS OF FACT

The parties are familiar with the underlying procedural background, which has been summarized extensively in prior orders in this case.  This is a wage and hour and retaliation case.  The DOL is in the midst of an investigation of Defendants, who own and operate an assisted living center called Lake Alhambra.  Ms. Sarkeshik Decl. ¶ 2.  On May 22, 2014, after finding substantial evidence that Defendants threatened their employees that they would lose their jobs if they cooperated with the DOL, the Court granted a TRO prohibiting, among other things, any obstruction of the DOL's investigation as well as any retaliation against Defendants' employees.  See Docket No. 6.  The Court further set a preliminary injunction hearing.  Id.

At the June 5, 2014 preliminary injunction hearing, Defendants stated that they were not opposed to the issuance of the DOL's requested relief, albeit with a few minor modifications. June 5, 2014 Transcript, 11:8-11.  Specifically, Defendants took issue with the language of the statements to be read to the employees by the DOL and Ms. Sarkeshik explaining the employees'

2

United States District Court
For the Northern District of California

right to be free from retaliation.  Defendants requested that the language of the statements be revised so that they would not admit any wrongdoing, but instead explain simply that it would be illegal to take retaliatory action against employees.  Id. at 11:12-25.  The Court agreed, advising that the statements could be changed to describe future action, e.g., the employer "must not coerce" instead of the employer must "cease coercing."  Id. at 12:11-14.  Defendants also indicated that they were not opposed to the DOL's proposed provision that no employee's schedule be reduced below thirty six hours per week, but wanted to make sure that there was no employee who regularly worked part time.  Id. at 12:18-13:2.  The Court responded that, if Defendants could show that an employee historically worked part time, then an exception could be made.  Id. at 13:18-20.  Because both parties agreed that these modifications would be reasonable, the Court noted that there was not "really . . . a dispute" and it would "issue a preliminary injunction."  Id. at 12:15-17.  The Court ordered the DOL to submit a modified proposed order reflecting the discussed changes.  Id. at 16:25-17:5.  The Court warned that Defendants could be liable for civil and then criminal contempt if they violated any Court order, which could result in fines or even jail time.  Id. at 14:11-14.

On June 20, 2014, the Court granted a preliminary injunction largely consistent with the DOL's proposed order, requiring Defendants to refrain from reducing employees' hours below thirty-six hours weekly unless the employee's median weekly hours computed over the last three months was lower.  Docket No. 21 at 16 ¶ 13.  Defendants were also required to provide seven days

written notice to the DOL before terminating any employees prior to resolution of this case.  Id. ¶ 12.

On June 9, 2014, the DOL and Defendants arranged to have the DOL describe the terms of the DOL's proposed preliminary injunction in the presence of Defendants and the employees of Lake Alhambra.  Bremer Decl. ¶ 3.  After the employees heard the statement of their rights, including the thirty-six hour provision, one of them asked if she could still take time off for her wedding.  Solis Decl. ¶ 8.  The DOL representative explained that the provision was not intended to prevent employees from taking time off, but was meant to protect them from retaliatory reductions of their hours.  Id.

On June 14, 2014, Defendants held a meeting to coerce employees to take unpaid vacation.  Carrasco Decl. ¶ 4; Employee #1 Decl. ¶ 2-3; Employee #2 Decl. ¶ 2-3.  Dr. Sarkeshik spoke, with manager Maricela Torres explaining his statements in Spanish. Id.  Dr. Sarkeshik and Maricela stated that the employees would take turns taking one week of unpaid vacation.  Id.

At the contempt hearing, two employees, Ana #1 and Beatriz, testified credibly that Defendants coerced employees to take unpaid vacation.  Ana #1 stated that Dr. Sarkeshik held a meeting on June 14, 2014 to discuss the schedule for the following week. July 3, 2014 Transcript at 14:2-15:12.  About eight employees were present and the meeting lasted about twenty minutes.  Id.  Dr. Sarkeshik does not speak Spanish, the primary language spoken by his employees, and so other bilingual employees translated for him.  Id. at 16:5-13.  Ana #1 testified that Dr. Sarkeshik told the employees that he was giving each of them a week of unpaid

4

vacation.  Id. at 16:2-4 ("The doctor told us he was giving us a week of vacation"), 16:14-19 (stating that she knew it would be unpaid because "they don't even pay us one hour of overtime let alone a week").  Dr. Sarkeshik said employees could take this time to visit their families in Mexico and take care of their own affairs.  Id. at 16:21-23.  Ana #1 was disturbed by Dr. Sarkeshik's decision to give everyone a week off to "take care" of their "problems," which suggested that they might soon be laid off.  Id. at 16:21-17:7.

Beatriz corroborated Ana #1's testimony about the June 14, 2014 meeting.  Beatriz confirmed the time and attendees.  Id. at 30:2-23.  Dr. Sarkeshik spoke about the schedule, with other employees translating.  Id. at 30:23-31:4.  He stated, through Maricela as a translator, that the employees would be taking turns taking a week off because the work level had gone down.  Id. at 32:17-25.  Dr. Sarkeshik said "yes" to verify what Maricela said.  Id. at 33:1-16.

Beatriz testified that "from the start" she asked for two days off, June 21 and June 22, to accompany her husband to his doctor's appointment and to spend time with him afterwards.  Id. at 34:9-16.  When she turned in a form requesting two days off, Dr. Sarkeshik stated "one week" and gave her a second form to fill in.  Id. at 34:17-24.  Beatriz filled out the second form requesting vacation for the week of June 16 to June 23.  See Dr. Sarkeshik Decl., Ex. D.  She said that she did so "because they said it had to be a week.  It's -- it would run from Monday to Monday."  July 23, 2014 Transcript at 37:25-38:1.  When pressed further about her motivations for changing her request, Beatriz

United States District Court
For the Northern District of California

5

stated she had heard her coworkers saying they were worried about

making their rent and car payments.  Id. at 49:19-50:6.  She also

stated that she wanted to be with her husband, who was about to

find out how much time he had left to live.  Id.  Beatriz

elaborated that, because she understood that they would be taking

turns in accepting a week of unpaid vacation, she volunteered to

do so first to allow others to work more hours and make more

money.  Id. at 52:15-53:8.

　　　During the hearing, there was some lack of clarity over

Beatriz's testimony.  Defendants' counsel repeatedly asked Beatriz

whether she was coerced into taking a week off or whether she did

so of her own "initiative"; Beatriz agreed that she "took the

initiative" to take the week off.  See, e.g., id. at 55:12-23.[1]

However, this statement was not inconsistent with the remainder of

---

[1]

DEFENDANTS' COUNSEL: Hi. I just want to clarify.  I
understood your previous testimony to be, and I quote, "I
took the initiative to ask for more time off."  Is that
correct?

BEATRIZ: Yes.

DEFENDANTS' COUNSEL: Because you had heard from Mariciela
[sic] that people were taking a week off?

BEATRIZ: No.  Mariciela [sic] told us we were going to be
taking one week.

DEFENDANTS' COUNSEL: So if you took the initiative to ask for
more time off, the Doctor didn't ask you to take a week off;
is that correct?

BEATRIZ: That's, that's correct.  Yes.  That's the way it
was.

DEFENDANTS' COUNSEL: Thank you.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Beatriz's testimony.  As stated previously, Beatriz explained that she was the first one to volunteer to take the week off because she knew Defendants would require someone to take the week off, felt the others were not so well off financially, and additionally wanted to take time be with her husband.  Although Beatriz was also motivated by these other concerns, she would not have felt the need to volunteer to take an entire week off had it not been for Dr. Sarkeshik's statement through Maricela that employees had to take turns doing so.  Considering Defendants' counsel's repeated arguments about semantics, as well as Beatriz's lack of English fluency and use of an interpreter, the confusion over whether she "took the initiative" was understandable.

In his declaration, Dr. Sarkeshik denied that he held a meeting to discuss vacation policies or to coerce employees to take turns accepting a week off without pay.  Dr. Sarkeshik Decl. ¶ 9.  At the contempt hearing, he testified that, after the DOL's visit on June 9, 2014, he understood that he was not to schedule workers for less than thirty-six hours per week.[2]  Unlike in his declaration, at the hearing Dr. Sarkeshik confirmed that the June 14, 2014 meeting took place.  However, he again denied that he ever coerced employees to take turns accepting a week of unpaid vacation.  He confirmed that Beatriz turned in a form requesting a week off and that she was not paid during that time.  Dr. Sarkeshik also stated that the following week, Maricela took unpaid vacation; the week after that, another employee took unpaid

---

[2] At the time of the issuance of this order, the court reporter's final transcript had not been published, so precise citation is not available.

United States District Court
For the Northern District of California

1  vacation.  He claimed that all three employees submitted their
2  requests for unpaid vacation of their own accord.

3      Maricela, a manager at Lake Alhambra who enjoys a good
4  relationship with the owners, testified as well.  She denied that
5  she or Dr. Sarkeshik told the employees that they would have to
6  take turns accepting an unpaid vacation.  She contradicted
7  Beatriz's testimony, stating that Beatriz held up four fingers to
8  indicate the number of appointments she had to attend and said she
9  wanted to take one week.  Maricela said, on the day of the
10 meeting, Beatriz herself filled out her first and only form
11 requesting an entire week's vacation.  In other words, according
12 to Maricela, there was no first form requesting two days of
13 vacation.  This assertion is contradicted by the form itself,
14 which is dated a day later, on June 15, 2014, by both Beatriz and
15 Dr. Sarkeshik.  The form also says "one week" in English next to
16 the dates requested, which, because Beatriz does not appear to
17 read or write English, would contradict Maricela's assertion that
18 Beatriz filled out the form herself.

19     The Court finds Ana #1 and Beatriz's testimony to be more
20 credible than that of Maricela and Dr. Sarkeshik.  They
21 corroborated each other's testimony about the June 14, 2014
22 meeting held by Dr. Sarkeshik.  Although Beatriz spoke about her
23 other personal concerns for taking a week off, she never wavered
24 from  her testimony that Dr. Sarkeshik and Maricela first told the
25 employees they had to take turns accepting an unpaid week off.
26 Although Dr. Sarkeshik and Maricela testified to the contrary, Ana
27 #1's and Beatriz's demeanors were more sincere and forthcoming.
28 Maricela's testimony appeared to be rehearsed and contradicted the

undisputed facts.  Other employees accompanying Defendants and
Maricela made intimidating faces and gestures during Ana #1's
testimony and had to be excluded from the proceedings.  Other
circumstantial evidence supports Ana #1 and Beatriz's accounts.
It is probable that Defendants first conceived the idea of
requiring employees to take turns accepting unpaid vacation on the
day of the DOL's visit to Lake Alhambra, when employees asked DOL
personnel whether they could still voluntarily take time off under
the terms of the preliminary injunction.  When the DOL clarified
that employees could do so, Defendants could have seen employee-
initiated vacation requests as a way to circumvent the preliminary
injunction's thirty-six hour minimum requirement.  It is also
highly suspect that, as Dr. Sarkeshik himself admitted, three
employees have each taken an unpaid week off in succession.

In sum, there is ample credible evidence that Defendants
coerced their employees to initiate week-long unpaid vacation
requests.

Defendants state that they have been interested in selling
their property for quite some time.  Dr. Sarkeshik Decl. ¶ 3.
They listed the business for sale in February 2014.  Id. ¶ 5.  At
some undisclosed time, Defendants received an offer for the
purchase of Lake Alhambra and they accepted it on June 6, 2014.
Id. ¶ 6.  According to the DOL, the sale is scheduled to close on
August 5, 2014.  The purchase agreement requires that the seller
"terminate all employees effective at Midnight on day before Close
of escrow."  Id., Ex. A (Purchase Agreement) ¶ 19.  The buyer may
elect to rehire any of the employees.  Id.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Defendants informed the residents and their families of the

2    potential sale as required by California law.  Ms. Sarkeshik Decl.

3    ¶ 5.  The employees overheard Defendants telling the residents and

4    asked about the sale.  Id. ¶ 6.  According to employees, Ms.

5    Sarkeshik announced to the employees that Defendants were selling

6    Lake Alhambra.  Employee #2 Decl. ¶ 4.  She told the employees

7    they had sixty days to find a new job or to find out whether the

8    new owners would keep them.  Id.  Ms. Sarkeshik said that if the

9    employees did a good job, the new owner would keep them; if not,

10   the new owner might reduce their hours or fire them.  Id.  The

11   Court finds that the timing, terms and circumstances of this sale

12   raise an unrebutted inference of retaliatory intent.

13                            LEGAL STANDARDS

14   It is well-established that civil contempt may be used to

15   ensure compliance with federal labor laws, including the FLSA.

16   McComb v. Jacksonville Paper, Co., 336 U.S. 187, 191 (1949).

17   Civil contempt is not aimed at subjecting the defendants to

18   penalty or hardship, but requiring them to comply with the law.

19   Id.; Wirtz v. Ocala Gas Co., 336 F.2d 236, 240 (5th Cir. 1964).

20   To establish civil contempt, the movant must show that the

21   defendant disobeyed a "specific and definite" court order.  In re

22   Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693,

23   695 (9th Cir. 1993).  The violation need not be willful as there

24   is no good faith exception to the rule of obedience to a court

25   order.  Id.  However, the defendant should not be held in contempt

26   where his actions appear to be based on "good faith and reasonable

27   interpretation of the court's order."  Id.

28

United States District Court
For the Northern District of California

If the movant is able to prove that the defendant failed to comply with the injunction, he has established a prima facie case for civil contempt. Hodgson v. Hotard, 436 F.2d 1110, 1115 (5th Cir. 1971). It then falls on the defendant to show why he was unable to comply. FTC v. Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir. 1999). The defendant must show that he took all reasonable steps to comply, yet could not do so. Stone v. City & Cnty. of San Francisco, 968 F.2d 850, 856 (9th Cir. 1992).

After finding that a defendant violated a specific and definite court order, the court has discretion to fashion additional injunctive relief as a sanction for contempt. A&M Records, Inc. v. Napster, Inc., 284 F.3d 1091, 1098 (9th Cir. 2002) (because "a district court has inherent authority to modify a preliminary injunction in consideration of new facts," it was justified in requiring Napster to use a new, more effective filtering mechanism to prevent copyright infringement). See also Omaha Indem. Co. v. Wining, 949 F.2d 235, 238 (8th Cir. 1991) (affirming district court's decision to impose additional sanctions on a defendant, restraining his personal and business expenditures and appointing a receiver "to stop 'elaborate winking' at [the court's] prior decree, as well as outright disobedience"); Roslies-Perez v. Superior Forestry Serv., Inc., 652 F. Supp. 2d 887, 889-90 (M.D. Tenn. 2009).

DISCUSSION

The DOL argues that Defendants should be held in civil contempt because they reduced employee hours and engineered a retaliatory sale of their business, in contravention of the Court's order. At the time Defendants took these actions, the TRO

11

United States District Court
For the Northern District of California

prohibiting any retaliation was in effect.  Although the preliminary injunction order had not yet been signed, Defendants expressed that they did not oppose its issuance and the Court indicated that substantially all of the proposed terms were "not in dispute."  Further, DOL personnel read the revised proposed preliminary injunction at Defendants' workplace before it was officially signed into effect, and so Defendants were on notice that certain actions, such as reducing employee hours or threatening termination, would be considered retaliatory.  <u>Cf.</u> <u>U.S. v. Westinghouse Elec. Corp.</u>, 648 F.2d 642, 653 (9th Cir. 1981) (parties bound by magistrate judge's proposed order, which had not yet been signed by the district judge, since parties knew it would likely be signed).

As discussed previously, the Court found after considering the factual record that Defendants coerced their employees to take unpaid vacation time.  In the past, Defendants have reduced the hours of employees for retaliatory purposes.  Because an employee is paid based on the hours she is scheduled, Defendants can reduce an employee's wages by reducing her weekly hours.  The TRO and preliminary injunction put Defendants on notice that such actions would be seen as retaliatory and were forbidden.  Defendants' new policy of requiring employees to take turns accepting unpaid vacation is equivalent to reducing the employees' pay to punish them.  This policy violates the Court's order.

Thus, Defendants must pay Beatriz's wages for the five days she did not work.  This is necessary to cure Defendants' retaliatory activities in violation of the Court's preliminary injunction.  Going forward, if Defendants coerce any employee to

take unpaid vacation, they will have to pay the wages of that employee for that time, up to thirty-six hours per week.  If the DOL is forced to bring a motion to compel enforcement of the Court's orders, Defendants will also have to pay the DOL $1,000 as reasonable compensation for bringing the motion, as well as any additional relief the Court deems necessary.  The payment should be sufficient to compel Defendants to obey the terms of the preliminary injunction.

If Defendants continue to violate the Court's order, additional sanctions may be necessary.  Defendants have retaliated against their employees at every stage of this proceeding, despite the initiation of this lawsuit, the issuance of the TRO, the issuance of the preliminary injunction, and the Court's warnings at both hearings.  Defendants' apparent disregard for both the Court's and the DOL's authority demonstrates that it is likely that Defendants will continue to circumvent the Court's orders. If Defendants do so, the Court will appoint a monitor such as the Workers Rights Consortium (WRC) to ensure Defendants' compliance. See Remedies Brief at 14.  In the meantime, the DOL may refer the employees to Centro Legal de la Raza, which can provide the employees with legal consultation free of charge.

The DOL contends that the terms of Defendants' sale of Lake Alhambra are also retaliatory.  While Defendants have a right to sell their business, they cannot do so in a manner that would violate the Court' order prohibiting retaliation.  "The causal link between a protected activity and the alleged retaliatory action can be inferred from timing alone when there is a close proximity between the two." Thomas v. City of Beaverton, 379 F.3d

802, 812 (9th Cir. 2004) (internal quotation marks omitted).
Here, as found above, the timing and terms of Defendants' decision
to sell Lake Alhambra raise an inference of retaliation.
Defendants accepted the offer to purchase Lake Alhambra one day
after the preliminary injunction hearing, after the Court
indicated its inclination to grant a preliminary injunction order
including substantially all of the terms proposed by the DOL.  The
terms of the purchase agreement provide that Defendants will
terminate all employees before escrow is closed.[3]  Defendants
never told the DOL or the Court of this mass termination
provision, which under the preliminary injunction requiring seven-
day notice of any employee termination should have been disclosed.
Despite Dr. Sarkeshik's claim that he did not know about the
provision because the broker wrote it, Defendants' behavior
suggested that they not only knew about the provision, but were
using that information to create fear amongst employees.  As
alleged by the employees, Ms. Sarkeshik told them that the buyer
might not rehire the employees unless they did a good job with
Defendants.  The temporal proximity of Defendants' mass
termination provision and the DOL's pursuit of injunctive relief
on the employees' behalf establishes retaliation.

---

[3] A mass termination provision with no rehire provision does
not appear to be the normal circumstance.  "In most cases, the
seller and buyer share a desire to make the transition as easy as
possible so as not to adversely affect the morale of the
workforce.  For this reason, the seller may prevail upon the buyer
to agree to employ all the employees after the closing."  ABA,
Committee on Negotiated Acquisitions, Model Asset Purchase
Agreement with Commentary at 204 (2001).

**United States District Court**
For the Northern District of California

1    The DOL suggests that Defendants may additionally perceive

2    the sale as a way to dodge liability for backpay.  Defendants may

3    owe up to $553,000 in unpaid minimum wage and overtime

4    compensation, along with any liquidated damages.  Dr. Sarkeshik

5    acknowledged that he would be responsible for any backpay or

6    overtime owed to his employees.  Any bona fide successor in

7    interest who maintains the business may be subject to successor

8    liability if he has notice of the liability.  Steinbach v.

9    Hubbard, 51 F.3d 843, 845 (9th Cir. 1995).  Although according to

10   the purchase agreement, Defendants promised to provide the buyer

11   with information about any "claims or notices from any current or

12   former employee, or governmental agency, regarding any employee

13   issue," Dr. Sarkeshik admitted he did not give the buyer a copy of

14   any of the documents  filed in this case, but only informed the

15   buyer verbally of the existence of the suit.  Dr. and Ms.

16   Sarkeshik could sell Lake Alhambra and drain the corporate

17   entity's assets, leaving the employees with no recourse before the

18   Court can adjudicate the wage and hour allegations underlying this

19   case.

20        Where it is likely that the claimed assets will be

21   dissipated, or monetary damages will be unrecoverable, the Court

22   has authority to enjoin asset transfer or freeze assets to

23   maintain the status quo before judgment is entered.  Johnson v.

24   Courturier, 572 F.3d 1067, 1083-85 (9th Cir. 2009); In re Estate

25   of Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1478 (9th

26   Cir. 1994).  Because Defendants' abrupt sale of Lake Alhambra

27   shows an intent to retaliate against their employees and to

28   liquidate their assets and dissipate them before judgment can be

United States District Court
For the Northern District of California

entered, in violation of the Court's order, an injunction to preserve the status quo is necessary.  Defendants and their agents are hereby preliminarily enjoined from selling, transferring, assigning, or otherwise disposing of any interest in Fatima/Zahra, Inc.'s assets; specifically, they are enjoined against closing the sale of Lake Alhambra.  Defendants can obtain relief from this portion of the injunction by submitting proof that they have provided the buyer with all of the pleadings in this case, obtained a new agreement without the term requiring termination of all of the employees, and posted a bond or arranged for an escrow in the amount of $553,000, which would be available to satisfy a potential judgment in this case.  See Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 881 (9th Cir. 2003) (affirming the district court's asset-freezing injunction because of the defendants' history of "fraudulent intra-family transfers, their refusal to disclose asset information in defiance of court order and their convenient divorce settlement"); Kontrabecki v. Lehman Bros. Holdings, Inc., 2006 WL 249515 (N.D. Cal. 2006).  This order ensures that Defendants cannot use the sale to escape liability and retaliate against their employees, while at the same time it allows Defendants to complete the sale of the property if they so wish.

IT IS SO ORDERED.

Dated:  08/05/2014

CLAUDIA WILKEN
United States District Judge